Upon review of all the competent evidence of record with reference to the errors assigned, and finding no good ground to receive further evidence or to rehear the parties or their representatives, the Full Commission, upon reconsideration of the evidence, MODIFIES IN PART and Affirms IN PART the Opinion and Award of the Deputy Commissioner as follows:
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement and at the hearing as
STIPULATIONS
1. On the date of plaintiff's alleged injury or occupational disease, the parties were subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. On that date, an employment relationship existed between plaintiff and defendant.
3. A set of exhibits attached to the parties' Pre-Trial Agreement consisting of an employment application form, a discharge form, a job description, attendance records, a discipline file and job evaluations are admitted into evidence.
4. Medical records from defendant, Dr. Craig Ryder, Dr. Robert B. Hansen, Dr. Colin Jones, Dr. Helen E. Harmon and Bertie Rural Health are admitted into evidence.
* * * * * * * * * * *
Based upon all of the competent evidence of record, the Full Commission MODIFIES IN PART and ADOPTS IN PART the Findings of Fact by the deputy commissioner and finds as follows:
FINDINGS OF FACT
1. At the time of the hearing, plaintiff was thirty-four years old, single and the mother of three children. Plaintiff completed the ninth grade of high school. Her work history consisted of employment picking crabs, grading peanuts and working as a housekeeper. Plaintiff began working for defendant as a trimmer in February 1993.
2. At the time of her termination of employment with the defendant, plaintiff's average weekly wage was $258.00.
3. As a trimmer, plaintiff was responsible for trimming defects, fat and bones from chicken breast as they passed her work station on moving hooks. As the breasts passed her station, plaintiff would remove the breasts from the hooks with her left hand and trim them using a pair of scissors. Plaintiff held the scissors in her right hand. Plaintiff made between four and five cuts on each breast. After trimming the breasts, plaintiff placed them back onto the moving hooks using her left hand. Plaintiff trimmed approximately five breasts per minute.
4. Defendant's employees who worked as trimmers were regularly rotated to other positions that did not require hand movements of the nature performed while trimming. The other positions to which plaintiff and the other employees rotated were tagging, "portions" and weighing. Defendant's policy of rotating trimmers into these other positions was designed to minimize the risk of its employees developing repetitive motion injuries.
5. Nevertheless, in October 1993, plaintiff began experiencing right hand pain for which she presented to Dr. Colin Jones. Dr. Jones prescribed medication, a splint for her right hand and more frequent work station rotations. Thereafter, plaintiff continued to experience hand discomfort and on 2 December 1993 she was referred to Dr. Robert B. Hansen. On that date, plaintiff was experiencing pain in both hands. After examining plaintiff, Dr. Hansen released her to return to the modified work that was previously approved by Dr. Jones.
6. Plaintiff's hand pain, which was greater on the right than the left, was caused by bilateral carpal tunnel syndrome and tenosynovitis in the metacarpophalangeal or MCP joint of her right third finger. Plaintiff's right volar carpal ligament was thicker than normal and her repetitive motion work for the defendant significantly aggravated this condition and caused her to contract carpal tunnel syndrome.
7. Plaintiff's tenosynovitis and carpal tunnel syndrome were caused or significantly aggravated by her employment as a trimmer for defendant. Plaintiff's employment with defendant placed her at an increased risk of developing tenosynovitis and carpal tunnel syndrome as compared to members of the general public not so employed. As a result of her tenosynovitis and carpal tunnel syndrome, plaintiff is incapable of returning to work as a trimmer.
8. As a result of her hand pain, defendant relieved plaintiff of all work as a trimmer beginning in November 1993. Plaintiff continued working in the other rotating positions through June 1994. Plaintiff was capable of working in these positions through that date.
9. Due to plaintiff's inability to work as a trimmer and her restriction to light duty positions available in the defendant's rotation schedule, defendant testified that their trimmer rotation schedule was somewhat "disrupted". To alleviate this "disruption" and to continue to provide plaintiff with work suitable to her condition, defendant offered plaintiff a night shift position as a wrap shaper. This position required the employee to position chicken on trays so that the pieces were neat and did not overhang the trays' edges when they were wrapped. The physical requirements of this position were consistent with plaintiff's abilities.
10. During a meeting on 6 July 1994, defendant offered plaintiff the night shift wrap shaper position. There is conflicting evidence as to the plaintiff's response to this offer. The plaintiff testified that she said she would try the night shift work offered. The plant's human resources representative testified that the plaintiff refused to attempt the night shift position offered. The Full Commission adopts the Findings of Fact by the Deputy Commissioner that plaintiff refused the night shift job offer. Plaintiff's refusal of an offer of suitable employment would constitute grounds for suspending benefits, but plaintiff was not receiving compensation as she was earning full wages at the time. To allow plaintiff to adjust to the new shift, defendant informed plaintiff that she would not be required to begin the new position until 17 July 1994. Plaintiff had a prior appointment with Dr. Robert B. Hansen on 21 July 1994 to determine the extent of her carpal tunnel syndrome problem. Plaintiff worked July 7th and 8th. Plaintiff called in as sick on the 11th and did not work on the 12th and 13th. The defendant terminated plaintiff on 13 July 1997 pursuant to their absenteeism policy which provides that six occurrences, regardless of the reason, constitute grounds for termination. (An employee has to work 28 consecutive calendar days in order to cancel out one absence.) Plaintiff testified that her absences from work on July 11, 12, and 13 were due to pain from her work-related carpal tunnel syndrome and tenosynovitis. Plaintiff's performance evaluation dated February 7, 1994 rated her attendance over the prior six months as good in that she only had two absences during this period.
11. Plaintiff's absences from work without calling in on two days, along with her prior verbal refusal of night shift work, constituted constructive refusal to accept suitable employment.
12. Plaintiff's tenosynovitis did not diminish her capacity to earn wages from defendant. Plaintiff has no permanent impairment as a result of her tenosynovitis.
13. As a result of her carpal tunnel syndrome, plaintiff became totally unable to earn wages in any employment beginning 13 September 1994 due to her surgery. Plaintiff remained totally disabled from 13 September 1994 through 19 December 1994 when she reached maximum medical improvement.
14. After 19 December 1994, when the plaintiff reached maximum medical improvement and was released to return to work, the plaintiff did not seek other employment within her restrictions. Dr. Craig Ryder opined that plaintiff should not return to a job involving repetitive motion. Plaintiff has not made a reasonable effort to find suitable employment after her release to return to non-repetitive work.
15. Plaintiff also has fibromyalgia. However, the evidence of record is insufficient to prove by its greater weight that plaintiff's fibromyalgia was caused or significantly aggravated by her employment with defendant or that her employment placed her at an increased risk of developing this condition.
16. Plaintiff has not sustained any permanent disability as a result of her occupational diseases.
* * * * * * * * * * *
Based on the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
CONCLUSIONS OF LAW
1. Plaintiff's tenosynovitis and carpal tunnel syndrome are due to causes and conditions characteristic of and peculiar to her employment with defendant, are not ordinary diseases of life to which members of the general public not so employed are equally exposed and are, therefore, occupational diseases. N.C. Gen. Stat. § 97-53(13); Rutledge v. Tultex Corp., 308 N.C. 85,301 S.E.2d 359 (1983).
2. A disease is an occupational disease compensable under N.C. Gen. Stat. § 97-53(13) if claimant's employment exposed her to a greater risk of contracting this disease than members of the public generally and such exposure significantly contributed to, or was a significant causal factor in, the disease's development.Rutlege v. Tultex Corp., 308 N.C. 85, 101, 301 S.E.2d 359, 369-70
(1983). Plaintiff's fibromyalgia is not compensable under North Carolina's Workers' Compensation Act since plaintiff has not shown that her employment with defendant caused or significantly aggravated her fibromyalgia or exposed her to a greater risk of contracting this disease than members of the public generally.
3. Plaintiff's verbal refusal of the night shift job, and her absences from work immediately thereafter, constitute a constructive refusal of suitable employment provided by defendant and plaintiff is not entitled to compensation during the period of such refusal. Plaintiff became totally incapable of earning wages in any employment on 13 September 1994 when she underwent surgery for her work-related carpal tunnel syndrome. Plaintiff is entitled to temporary total disability compensation during the period she was incapable of earning wages from 13 September 1994 through 19 December 1994, when she reached maximum medical improvement and was released to return to non-repetitive work. N.C. Gen. Stat. §§ 97-32 and 97-29.
4. The plaintiff has not demonstrated that she has made reasonable efforts to find suitable employment since she reached maximum medical improvement and was released to non-repetitive work.
5. As a result of her compensable occupational diseases, plaintiff is entitled to payment of temporary total disability compensation at the rate of $172.01 per week from 13 September 1994 through 19 December 1994. N.C. Gen. Stat. § 97-29.
6. Plaintiff is entitled to payment of all medical expenses incurred or to be incurred as a result of her occupational diseases for so long as such examinations, evaluations and treatments tend to effect a cure, give relief, or lessen her disability. N.C. Gen. Stat. § 97-57; N.C. Gen. Stat. § 97-25.
* * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
AWARD
1. Defendant shall pay plaintiff temporary total disability compensation at the rate of $172.01 per week from 13 September 1994 through 19 December 1994. This amount shall be paid in a lump sum, subject to the attorney fee approved in paragraph 3.
2. Defendant shall pay all medical expenses incurred by plaintiff as a result of her occupational diseases for so long as such examinations, evaluations and treatments tend to effect a cure or give relief.
3. A reasonable attorney's fee of twenty-five percent of the compensation due plaintiff under paragraphs 1 of this Award is approved for plaintiff's attorney and shall be deducted and paid directly to plaintiff's attorney.
4. Defendant shall pay the costs, including expert witness fees of $200.00 for Dr. Helen E. Harmon, $200.00 for Dr. Robert B. Hansen, and $235.00 for Dr. Craig Ryder.
 S/ ____________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
S/ ____________ COY M. VANCE COMMISSIONER
S/ ____________ LAURA K. MAVRETIC COMMISSIONER